UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO: 3:07-CV-317-DCK

| | |
|---|---|
| PATSY M. DENNISON, an individual, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | **ORDER AFFIRMING THE** |
| ) | **ADMINISTRATIVE DECISION AND** |
| ) | **GRANTING SUMMARY JUDGMENT** |
| METROPOLITAN LIFE INSURANCE ) | **TO DEFENDANTS** |
| COMPANY; SPX LONG TERM DISABILITY ) | |
| PLAN; SPX CORPORATION, in its capacity ) | |
| as Plan Administrator of SPX Long Term ) | |
| Disability Plan, ) | |
| ) | |
| Defendants. ) | |

Plaintiff Patsy Dennison, through counsel, seeks judicial review of an unfavorable administrative decision on her 2003 application for long-term disability benefits under a group policy governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. Section 1001 *et seq*. The parties have filed cross-motions for judgment as a matter of law and/or summary judgment. (Document Nos. 6, 19). On December 4, 2008, counsel presented oral arguments at a hearing. This matter has been fully briefed and is ripe for review. The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c).

After careful consideration of the written and oral arguments, the administrative record, and applicable authority, the Magistrate Judge finds that the administrative decision was supported by substantial evidence and was not an abuse of discretion. Accordingly, the Magistrate Judge will **AFFIRM** the administrative decision, **GRANT** the Defendants' Motion for Summary Judgment (Document No.19), and **DENY** the Plaintiff's Motion for Judgment as a Matter of Law (Document No. 6) for the following reasons:

## I. Allegations

Plaintiff disputes the termination of her benefits, alleging that she is disabled under the terms of the employee benefit plan ("Plan") and that she did not receive a "full and fair review" of her claim for benefits. (Document No. 7, p.23).[1] Defendants contend that Plaintiff did not meet her burden of showing continued disability as defined by the Plan and has not shown that the Defendants' decision to deny further benefits was an abuse of discretion. (Document No. 20, p.2).

## II. Factual Background and Procedural History

The facts underlying the administrator's decision and administrative appeals are largely undisputed and will be summarized as briefly as possible.[2] From 1995 until April 2001, Patsy Dennison ("Plaintiff") worked full-time as an accounting co-ordinator in the finance department at SPX Corporation ("SPX") in Asheville, North Carolina. SPX offered a benefit plan ("Plan") that provided employees with long term disability benefits under specified circumstances defined by the Plan. (Document No. 22). These benefits were funded entirely by employee contributions to a voluntary employee benefits trust account. (Document No. 21, Exh.1, ¶4). Metropolitan Life Insurance Company ("MetLife") administered claims for the Plan.

On April 4, 2001, Plaintiff visited Dr. Eileen M. Wright, M.D., at the Great Smokies Medical Center for evaluation of a variety of reported problems, including chronic fatigue, marked weight loss, inability to gain weight, irritable bowel syndrome, menopausal symptoms, sinus problems, and anxiety/stress. (Document No. 8-8, pp.9-14 "first evaluation"). Dr. Wright noted that the plaintiff took no prescription medication, but used eleven different nutritional supplements

---

[1]For clarity's sake, the referenced page numbers reflect the docket numbering.

[2]Plaintiff acknowledges that "[t]he underlying facts do not seem to be the subject of any substantial dispute." (Document No.7, p.3). The Plaintiff has submitted a copy of the 642-page administrative record. (Docket No.8, Exhibits1-26).

including Chinese herbs. (Document No. 8-8, pp.9-10). Dr. Wright listed her impression as "chronic fatigue, cachexia (wasting), heartburn, flatulence/bloating, headaches, palpitations, menopause, irritable bowel syndrome, and asthma." (Document No. 8-8, p.14 ). Dr. Wright's notes indicate the Plaintiff was age 53, had a height of 5'3" and weighed 97 lbs. The notes also reflect that the Plaintiff considered her normal weight to be 110 lbs. (Document No. 8-8, p.13). Dr. Wright noted that, due to apparent fatigue and weakness, the Plaintiff's tandem stance was unstable. Dr. Wright advised Plaintiff to work part-time, or preferably not all, to alleviate stress. Plaintiff ceased work the next day.

Over the next year, Dr. Wright ordered various diagnostic tests which yielded "normal" or "unremarkable" results, with a few exceptions such as a bone density test which reflected deficits suggestive of osteoporosis.[3] (See Docket No. 8-5, pp.12-13, citing normal test results for albumin, hemoglobin, liver function, IgA, IgM, IgG, salivary cortisol, brain MRI, and WBC differential; Document No. 8-7, p.13, noting "normal" Adrenocortex stress profile, April 19, 2001; Document No. 8-10, p.2 noting that CBC blood work, comprehensive metabolic panel, and TSH test were all "normal"; Document No. 8-8, p.13 list of metabolic tests ordered). Although an assessment on March 6, 2002 of the Plaintiff's general physical fitness based on heart rate variability analysis indicated a significantly reduced level (see Document No. 8-6, p.18), the Plaintiff reported on 10/15/01 and 11/12/02 that her daily activities included driving, shopping, doing laundry, vacuuming, dusting, washing dishes, walking, reading, watching television, and using the computer. (Docket No. 8-5, pp.14-15).[4]

---

[3]The results of a "bone resorption assessment" performed at the Great Smokies Medical Center on March 12, 2002 were "normal." (Document No. 8-6, p. 24).

[4]Tests on July 2, 2001 indicated "lungs clear, heart and pulmonary vascularity unremarkable, bones intact, no active cardiopulmonary disease." (Document No. 8-22, p.16).

After initial consultation, Dr. Wright, a former emergency room physician referred to by Plaintiff as a "holistic" doctor, ordered additional tests that, according to the consulting physician, "are not typically recognized as generally of clinical value by the large majority of practicing internists."[5] (Docket No. 8-3, p.11). Dr. Wright, who indicates she "does not have a conventional practice," recommended alternative therapies, including multiple vitamins, multiple nutritional supplements, herbs such as ginseng, nasal spray, instruction on walking and stretching, health education counseling, and "thyroid replacement" with "glandular thyroid" medication. (Docket No. 8-5, p.22; 8-8, p.9; 8-13, p.23). The record reflects that Dr. Wright also recommended fasting and drinking Epsom salts, olive oil, and cider vinegar for colon and liver cleansing. (Document No. 8-19, p.5).

After ceasing work on April 5, 2001, Plaintiff applied for and received short-term disability benefits under her employer's group policy. On October 16, 2001, plaintiff sought and received approval for benefits through December 2001. Plaintiff returned to work on a part-time basis on February 1, 2002. Plaintiff indicates that she worked with some restrictions through spring of 2003 before allegedly becoming totally unable to work due to severe weight loss, fatigue, weakness, and gastro-intestinal problems.[6] The record indicates that Plaintiff received disability benefits for a total of 24 months under the group policy limits.

During this time, Dr. Wright referred Plaintiff to Dr. Margaret Colgate, PhD, for health education counseling. The record reflects that between November 21, 2002 and December 19, 2002, Dr. Colgate recommended various alternative treatments including selenium drops, use of a

---

[5] According to submitted materials, Dr. Wright is certified in emergency medicine by the American Board of Medical Specialities and has "over 200 hours of training in Ayurvedic Medicine enhancing her knowledge of medicinal herbs." (Document No.8-13, pp.19-20).

[6] Plaintiff's brief provides two different dates for her final cessation of work: April 21, 2003 or February 11, 2003. (See Document No. 7, p.11).

Hulda Clark type "zapper," a spin light, glycine between meals, weekly colloidal silver, "anger work," and a special diet. (Docket No. 8-21, pp.7-21). By spring of 2003, Dr. Colgate noted that "progress is slow but sure" (Document No. 8-21, p.12) and that the plaintiff had "marked improvement in digestion" (Docket No. 8-21, p.18).

On January 6, 2003, a nurse evaluated the claim file for MetLife. She recommended that Dr. Colgate's records for the past two years be obtained and that the file be reviewed by a consulting physician. (Document No. 8-5, p.20; 8-19, p.5). On February 3, 2003, Dr. Colgate responded that she was not a medical doctor and did not keep medical records. (Document No. 8-19, p.5). Dr. Colgate provided no documentation of any treatment or consultations with Plaintiff.

The Defendants referred the medical file to consulting physician, Dr. Gary P. Greenhood, M.D., for review. This physician was certified by the American Board of Internal Medicine in Internal Medicine and Infectious Diseases. He reviewed the medical file and prepared a detailed report advising that the file did not provide an objective basis for the Plaintiff's allegations of totally disabling physical problems. (Document No. 8-5, pp.12-15, February 13, 2003 report).

The record reflects that Dr. Greenhood contacted Dr. Wright by telephone for more information about the Plaintiff's medical condition and treatment. (Docket No. 8-5, pp.2,13). According to Dr. Greenhood, Dr. Wright indicated that although Plaintiff had numerous problems, her condition had been improving in various ways. For example, Dr. Wright reported that the Plaintiff had less anxiety, fewer incidents of gastro-intestinal problems, and had a "higher level of functioning than in 2001." (Docket No. 8-5, p.2). However, Dr. Wright also indicated that, in her opinion, the Plaintiff could still not work full-time. (Docket No. 8-5, pp.10-11). In a response to a written request for more information, Dr. Wright acknowledged that the plaintiff's physical problems were vague and could not be confirmed by any diagnostic tests. (Docket No. 8-2, p.14).

On March 25, 2003, the plaintiff's treating physician, Dr. Wright, responded to a written inquiry by the claims administrator and indicated that "my best assessment is that her chronic fatigue, weakness and cachexia are related to fat malabsorption." (Document No. 8-5, p.10). She advised that the Plaintiff had "chronic fatigue...and weakness but I do not think her symptom complex supports Chronic Fatigue Syndrome as defined by CDC definitions." (Document Nos. 8-5, p.10; 8-13, p.22, Response to Question #4). Dr. Greenhood had also indicated in response to written questions that "the current medical information does not enumerate the criteria recommended by the Center for Disease Control and Prevention for the diagnosis of chronic fatigue syndrome." (Docket No. 8-10, pp.1-2).

On March 27, 2003, the administrator sent a 3-page letter to plaintiff explaining that she was not entitled to further long-term disability benefits and that her benefits would end on April 4, 2003. (Docket No. 8-2, pp.17-19). The letter set forth the policy definition of disability, listed the medical records and other documents reviewed, and discussed the specific basis for the decision. A subsequent letter on August 12, 2003, provided the Plaintiff with a corrected definition of disability. (Docket No. 8-3, p.7).[7]

Plaintiff filed an administrative appeal on August 14, 2003, and supplemented the file with additional records, including progress notes from additional visits to Dr. Wright and Dr. Colgate from April 2001 through August 2003. (Docket No. 8-2, pp.20-22). Plaintiff provided 55 pages of records from Dr. Colgate, as well as a favorable decision for Social Security benefits. An additional consulting physician, Dr. J.W. Rodgers, M.D., Board Certified in Internal Medicine and Pulmonary Medicine, reviewed the updated file, including medical documents spanning the time period from 1990 to 2003. This physician advised that the objective medical data did not reflect a basis for any

---

[7]The initial definition was more lenient toward the claimant, as it required a threshold of only 60% of earnings to qualify for disability. (Document No. 8-2, p.17).

totally disabling physical condition. (Docket No. 8-25, p.24; 8-26, pp.1-2 "there is nothing in this file which would indicate that this patient has a documented medical problem by objective criteria or findings which would preclude sedentary levels of activity...").

The SPX Appeals Sub-Committee reviewed the supporting documentation in the updated file, and on October 3, 2003, denied the appeal. (Docket No. 8-3, pp.10-13). The written decision discussed the medical opinions in considerable detail and observed that "[s]elf-reported, subjective complaints, absent medical evidence of documented functional impairment, are insufficient to provide proof of disability." (Document No. 8-3, p.12).

On March 9, 2004, Plaintiff appealed a second time, furnishing recent progress notes from her treating physician and a two-page functional capacity exam ("FCE") performed on February 17, 2004, at Mountain Neurological Center. (Docket No. 8-3, pp. 17-18 additional documents; Docket No. 8-3, pp. 23-24 "FCE"). A third consulting physician, Dr. Katherine Duval, M.D., Board Certified in Occupational Medicine, examined this supplemental material and various other records (No. 8-28, pp.8-9).

In her report on June 15, 2004, Dr. Duval discussed the FCE's indication that the Plaintiff reportedly had "extremely poor endurance." Dr. Duval indicated that Plaintiff's weakness was due to the primary diagnosis of chronic fatigue and cachexia, but pointed out that the Plaintiff had been regaining weight. (Document 8-26, p.9). As of February 18, 2004, the medical records indicated that Plaintiff weighed 104.5 lbs. (Document No. 8-27, p.10). Dr. Duval advised that the Plaintiff had only mild impairment due to weight loss and pointed out the lack of any objective findings in the updated progress notes in 2003-2004.

In response to the written question "Based on the medical information provided, is this person unable to perform any occupation?," Dr. Duval answered that from an occupational medicine

standpoint and based on the available information, "Ms. Dennison is able to perform sedentary to light activities." Dr. Duval acknowledged that Plaintiff could not perform any heavy exertion, but advised that "the documentation does not support severity of a degree that would preclude her from totally working or doing most activities." (No. 8-28, p.9). The SPX Appeals Committee reviewed the updated file, and on June 21, 2004, denied the second appeal. (Docket No. 8-4, pp.21-22).

Plaintiff then sought judicial review in the Northern District of California. The case had no nexus with California and was transferred to the United States District Court for the Western District of North Carolina. The Defendants moved for partial summary judgment, and the Plaintiff indicated to the Court that she did "not object to dismissal of her second cause of action for breach of fiduciary duty." (Document No. 29 at 1). On July 1, 2008, partial summary judgment was granted with respect to Claim 2 of the Complaint. (Docket No. 36, Order).

### III. Exhaustion of Administrative Remedies

Under ERISA, a claimant must exhaust administrative remedies before bringing a federal lawsuit for judicial review of benefits termination. 29 U.S.C. § 1132(a)(1)(B); and see, *Gayle v. United Parcel Serv., Inc.*, 401 F.3d 222, 226 (4th Cir.2005). Plaintiff has completed the Plan's administrative appeals process regarding her benefits decision, and thus, has exhausted available administrative remedies. (Document 22, pp.20-21). This matter is ripe for judicial review.

### IV. Standard of Judicial Review

The United States Supreme Court has explained the standard of judicial review for ERISA cases under 29 U.S.C. § 1132(a)(1)(B) as follows: (1) courts should be "guided by principles of trust law;" (2) *de novo* review is appropriate unless a benefits plan provides otherwise; (3) where the plan grants the administrator discretion to determine eligibility for benefits, a deferential standard of review is appropriate; and (4) if the administrator has a conflict of interest, that conflict must be

weighed as a factor "in determining whether there is an abuse of discretion." *Metropolitan Life Ins. Co. v. Glenn*, – U.S. –, 128 S.Ct. 2343, 2347-2348 (2008), quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113-115 (1989).

In ERISA cases where the plan grants the administrator discretionary authority, "it is well-settled that courts review the denial of benefits under [the] policy for 'abuse of discretion.' " *Guthrie v. National Rural Elec. Coop. Ass'n Long-Term Disability Plan*, 509 F.3d 644, 649 (4th Cir.2007). An ERISA plan may confer discretion on its administrator either: (1) by language which expressly creates discretionary authority, or (2) by terms which "create discretion by implication." *Woods v. Prudential Ins. Co. of America*, 528 F.3d 320, 322 (4th Cir.2008), quoting *Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522-23 (4th Cir.2000). Whether express or implicit, the plan must clearly indicate intent to confer such discretion. *Gallagher v. Reliance Std. Life Ins. Co.*, 305 F.3d 264, 268 (4th Cir.2002); *Feder*, 228 F.3d at 523.

In the present case, the Plan expressly provides that the Plan Administrator "[h]as the absolute discretion and authority to: Interpret the terms of the Plan, including the Plan's eligibility provisions and its provisions relating to qualification for and accrual of benefits." (Document No.22, p.22). Given such express language, the abuse of discretion standard applies. See *Glenn*, 128 S.Ct. at 2347-2348. Although Plaintiff initially argued in her brief that *de novo* review of the administrative decision was appropriate (Document No. 7, p.15), Plaintiff appropriately conceded at the hearing that the correct standard was whether there was an abuse of discretion. (Hearing Transcript "TR" at p. 4, line 25 "Plaintiff so agrees"; and TR p. 5, lines 10-12 "So to the extent that my opening papers argued de novo, I concede that we're talking purely about the abuse of discretion.").[8]

---

[8]The version of the transcript cited herein is a draft.

Under this standard, "the district court functions as a deferential reviewing court with respect to the ERISA fiduciary's decision." *Evans v. Eaton Corporation*, 514 F.3d 315, 321 (2008). "We will not disturb an ERISA administrator's discretionary decision if it is reasonable..." *Id*. at 322. An administrator's decision is reasonable "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Id*.; *Guthrie*, 509 F.3d at 650. The Plaintiff bears the burden of proof to provide the requisite evidence to support a claim for disability benefits. *Elliott v. Sarah Lee Corp.*, 190 F.3d 601, 602 (4th Cir.1999).

To the extent Plaintiff suggests that the administrator was operating under a conflict of interest (TR p. 5, lines 20-21 "I think that there's a conflict that's cognizable"; TR, p. 2, lines 22-25, "the heart of the disagreement between the parties centers on how much deference this court should give the decision...."), the Defendants point out that neither the employer's money nor the claims administrators' money was involved in the payment of the benefits at issue. (TR 28, lines 2-5). Rather, the benefits were funded entirely by employee contributions. MetLife simply administered claims for the Plan. (Document No.22, p.21). Although the Defendants had the general duty to safeguard the employee funds for deserving claims, the record in the present case does not reflect any other significant "conflict of interest" that would alter the analysis.

## V. Analysis

When the administrator makes a reasonable decision supported by substantial evidence after a deliberate, principled reasoning process, courts may not disturb the decision. *Evans*, 514 F.3d at 322; *Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 126 (4th Cir.1994). In assessing the reasonableness of an administrator's decision, courts should consider the language of the plan, whether the decision making process was reasoned and principled, and the degree to which

the evidence supports the decision. *Guthrie*, 509 F.3d at 651; *Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir.2000).

The question before the administrator was whether the Plaintiff was entitled to continued long-term disability benefits under the Plan. The administrator considered the Plan's definition of disability:

> You are considered disabled under this Plan if, due to a non-work related illness or accidental injury, you are receiving appropriate care from a physician on a regular basis and:
> –for the first 24 months from the onset of the disability, you are not able to earn 70% of your pre-disability earnings from your regular occupation in the local economy; or
> –beyond the 24 months, you are not able to earn 70% of your pre-disability earnings at any occupation for which you are reasonably qualified in the local economy. (Document No. 22, p.11).

The language of the Plan specifically excludes coverage for "vague or indefinable" conditions. (Document 22, p.12). The Plan also limits coverage to 18 months if a claimant becomes disabled due to (a) mental or nervous disorder, (b) neuromusculoskeletal or soft tissue disorder, unless there is objective medical evidence of certain conditions; or (c) chronic fatigue syndrome and related conditions. (Document 22, p.14).

In her response, Plaintiff misconstrues the Plan language above to mean that her own condition did not have to be substantiated by objective medical evidence. (Document No. 28, p.6). Such misreading of the Plan language would lead to absurd consequences and falls quite short of demonstrating that the administrator abused any discretion by requiring objective evidence to support the claim for long-term disability benefits.

The administrator reviewed the claim file in its entirety and discussed the findings and opinions of both the treating physician and the consulting physician in considerable detail, including the fact that the conventional laboratory studies had yielded largely normal or unremarkable results.

(Document No. 8-2, p.17). Consulting physician, Dr. Gary P. Greenhood, M.D., advised in a detailed report that the file reflected no objective medical basis for the Plaintiff's allegations of a totally disabling physical condition. (Document No. 8-5, pp.12-15). Plaintiff's own treating physician had acknowledged that the plaintiff's physical problems were "vague by their nature" and could not be confirmed by any diagnostic tests. (Docket No. 8-2, p.14). In assailing the administrator's decision, the Plaintiff ignores the numerous references by her treating physician to diagnostic tests with normal results, choosing instead to emphasize her past weight loss and the "unexplained" nature of her condition. The Defendants point out that the Plaintiff had the burden of proof to provide the objective evidence necessary to support her claim. *Elliott v. Sarah Lee Corp.*, 190 F.3d 601, 602 (4th Cir.1999). The administrator reasonably concluded that the Plaintiff had not shown that she was disabled under the Plan definition, and thus, was not entitled to further benefits.

Although the Plaintiff appealed twice and supplemented the file with additional progress notes and other records, the three consulting physicians, all of whom were board-certified in their respective relevant areas of expertise, indicated that the Plaintiff had not shown any objective basis for her allegedly disabling condition.[9] As discussed in the initial decision and both appeals, the consulting physicians pointed out that the progress notes consistently failed to show objective diagnostic findings. With respect to these additional progress notes, a party cannot prevail merely by supplying additional deficient medical opinions unsupported by objective evidence. *Evans*, 514 F.3d at 323.

To the extent the Plaintiff complains that the opinion of her treating doctor regarding Plaintiff's alleged inability to work should have been given controlling weight, the United States Supreme Court has rejected the "treating physician" rule in ERISA cases. *Black & Decker*

---

[9]Although Dr. Wright is board certified in emergency medicine, the Defendants point out that such speciality is not directly relevant to the Plaintiff's symptoms. (Document No.38, p.8).

*Disability Plan v. Nord*, 538 U.S. 822, 834 (2003); *Evans*, 514 F.3d at 324. The Defendants point out that the Plaintiff's holistic doctor has no training or expertise in occupational training and provided no objective medical data to support her conclusions. Moreover, the treating physician acknowledged that the Plaintiff did not meet the CDC criteria for chronic fatigue syndrome and that the Plaintiff could perform part-time work in 2001.

Although the Plaintiff disputes the decisions reached on appeal, the medical records submitted on appeal showed significant improvement in weight gain for Plaintiff since 2001. The administrator considered the updated medical progress notes submitted by the Plaintiff for 2003-2004. Contrary to Plaintiff's assertion that she had never weighed over 99 pounds, Dr. Wright's progress notes from February 18, 2004 indicated the Plaintiff weighed 104.5 lbs. (an increase of six pounds in five months) and was "very stable." (Document 8-27, p.10). Plaintiff had previously indicated to her treating physician that her "normal" weight was 110 lbs. Given that the primary initial diagnosis in 2001 was chronic fatigue and the descriptive term "cachexia," which refers to unexplained wasting and inability to gain weight, the administrator reasonably concluded that the updated medical record, including the more recent progress notes, provided no basis to overturn the original decision.

An administrator's resolution of conflicting medical opinions is not an abuse of discretion, as long as the decision is reasonable. *Evans*, 514 F.3d at 325 (explaining that "[i]t is not an abuse of discretion for a plan fiduciary to deny disability pension benefits where conflicting medical reports were presented"); *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 606 (4th Cir.1999); *Booth*, 201 F.3d at 345-46; *Sheppard*, 32 F.3d at 125.

Importantly, the Fourth Circuit Court of Appeals has cautioned that it is not the function of this Court to re-weigh the evidence for itself. *Evans*, 514 F.3d at 325. Nonetheless, the parties

"pick endlessly at each other's evidence." *Id.* For example, Plaintiff makes much of a reference to "ataxia" in Dr. Rodgers' report. Plaintiff argues that the Defendants should not have relied on Dr. Rodgers' report because "it was clear he had not taken the time necessary to accurately review [Plaintiff's] record, as evidenced by his failure to properly set forth and evaluate her actual diagnosis of cachexia (instead of the erroneously stated ataxia)." (Document No. 7, p.25). Dr. Rodgers had reviewed the medical record, discussed Plaintiff's symptoms of chronic fatigue, weakness, and ataxia. Plaintiff's characterization of the reference to ataxia as a "mistake" reflecting incomplete or inadequate review is refuted by the record. The basis for his reference is found in the treating physician's own notes which refer to the Plaintiff's "unstable tandem stance." The Plaintiff's attenuated characterization of the administrative appeal as a "failure to exercise discretion" or a deprivation of "full and fair" review is unavailing.

Plaintiff also complains that on appeal, the Defendants "took no account of the Social Security Administration's findings." (Document No. 7, p.19). Plaintiff had submitted a copy of the SSI decision rendered on May 21, 2003. Of course, an SSI decision is not binding on the claims administrator or appeals committee. SSI determinations apply an entirely different definition of disability.[10] Additionally, Social Security regulations, unlike ERISA regulations, provide that treating physicians' opinions are generally given controlling weight when supported by objective medical diagnostics. Interestingly, the SSI decision failed to mention a single diagnostic test or other objective medical finding for Plaintiff's condition. (Document No. 8-2, pp.1-4). Although the ERISA appeal decision did not specifically discuss the SSI decision, little would be accomplished by discussing an SSI determination that was entirely devoid of any objective medical information.

---

[10]For purposes of Social Security, "disability" is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a) (1999).

The existence of an SSI award does not render a decision to deny benefits unreasonable. *Elliott*, 190 F.3d at 607.

With respect to the second appeal, the Plaintiff complains that the consulting physician, Dr. Duval, referred to possible psychological origins for Plaintiff's unexplained problems. Dr. Duval's analysis was based on the evidence of record regarding the Plaintiff's physical condition. Dr. Duval, a specialist in occupation medicine, reviewed the FCE which indicated the Plaintiff had extremely poor endurance. Dr. Duval noted that the FCE also indicated that Plaintiff's range of motion ("ROM") was not limited, and that she had no difficulty in the area of co-ordination and dexterity. (Document No. 8-3, pp.23-24). Dr. Duval concluded that the Plaintiff could still perform the sedentary and light duties of her clerical job. The administrator reviewed the updated file, including Dr. Duval's report, and reasonably concluded that Plaintiff had not shown that she met the Plan's definition of disability. The second appeal decision pointed out that there was no objective medical data to support the Plaintiff's allegedly disabling physical condition.[11]

Plaintiff alleges in attenuated fashion that the appeal committee "failed to exercise the discretion granted under the Plan." (Document No. 7, p.). Essentially, the Plaintiff complains that the administrative appeals were a "rubber-stamp" of the initial decision. The ERISA regulations require the Plan to provide "for a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual." 29 C.F.R. § 2560.503-1(h)(3)(ii).

---

[11]Dr. Duval raised the possibility that some of Plaintiff 's unexplained problems might be psychological. Of course, the treating physician's own notes refer to the Plaintiff's anxiety, stress, panic attacks in prior years, and interpersonal difficulties. (Docket No. 8-5, p.3). Dr. Duval pointed out that the file contained "no description of the severity of her anxiety" or "whether it is of a level that would disable her from her job." (Docket No. 8-26, p.9).

The Plaintiff's characterization of the administrative appeal process as a "rubber-stamp" is unavailing. Both appeal decisions carefully explained why the Plaintiff did not meet the criteria for disability and gave the basis for the decision in sufficient detail to show a reasoned approach based on substantial evidence of record. After the MetLife claims administrator terminated benefits, each appeal decision was made by an SPX review committee which considered additional medical records and additional medical review by an additional consulting physician with specialized expertise. Overall, the administrator appropriately sought review of the medical records by three different board-certified physicians, one at each level of the administrative process.[12] Plaintiff's allegation that the Defendants merely deferred to the initial decision is conclusory. The analysis in both decisions on appeal indicated that the Plaintiff's claims were given a new look with updated information of record. The record reflects that the Defendants provided the Plaintiff with "full and fair" review of her claim.

With respect to Plaintiff's third cause of action for statutory penalties for alleged failure to provide requested documentation, Plaintiff did not make any developed argument for this claim in her brief or at the hearing. To the extent that the Plaintiff fleetingly complains in her motion that she was not given the disability definition, the record reflects that she did in fact receive a disability definition, as well as a corrected version thereafter. (Docket No. 8-3, p.7, letter of August 12, 2003). Substantial compliance with ERISA procedural requirements is generally sufficient. *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 238 (4th Cir. 1997); *Brogan v. Holland*, 105 F.3d 158, 165

---

[12]The ERISA regulations require that the Plan must provide that, "in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, including determinations with regard to whether a particular treatment, drug, or other item is experimental, investigational, or not medically necessary or appropriate, the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. § 2560.503-1(h)(3)(iii) (2007).

(4th Cir. 1997); and see, e.g., *Larson v. Old Dominion Freight Line, Inc.*, 277 Fed. Appx. 318, 321, 2008 WL 2035618 (4th Cir. (N.C.)) ("it is well-established that failure to technically comply with all of ERISA's procedural requirements does not automatically invalidate an otherwise sound denial of benefits."). The record reflects that the administrator provided the Plaintiff with requested information relevant to her claim, and that Plaintiff had a full opportunity to present her case and supplement the record on appeal.

In conclusion, the administrator's initial denial, and the subsequent appeal decisions, were based on substantial evidence. The reasoning process throughout the administrative decision-making process was reasonable and principled. The record reflects no abuse of discretion regarding the termination of Plaintiff's long-term disability benefits.

## VI. Conclusion

In accordance with the foregoing, **IT IS ORDERED** that:

1. The administrative decision is **AFFIRMED**;

2. Defendants' Motion for Summary Judgment ((Document No.19) is **GRANTED**; and

3. Plaintiff's Motion for Judgment as a Matter of Law ((Document No.6) is **DENIED.**

Signed: January 8, 2009

David C. Keesler
United States Magistrate Judge